**Opinion filed April 9, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00191-CV

_____

## OSCAR DOMINGUEZ, Appellant

## V.

## ALETHA MARIE DOMINGUEZ, Appellee

**On Appeal from the County Court at Law No. 2**
**Midland County, Texas**
**Trial Court Cause No. FM67742**

## M E M O R A N D U M   O P I N I O N

Appellant, Oscar Dominguez, appeals the trial court's final decree of divorce dissolving his marriage to Appellee, Aletha Marie Dominguez. Oscar raises two issues on appeal, arguing that (1) the trial court abused its discretion by awarding spousal maintenance to Aletha Marie, and (2) the trial court "erroneously altered a statutory scheme by restricting [his] ability to seek a future modification" of the judgment regarding spousal maintenance. We affirm.

## I. *Factual and Procedural History*

Oscar and Aletha Marie entered into an informal marriage[1] on November 1, 2004. Their child, A.D., was born on August 26, 2005. Oscar initiated divorce proceedings in 2020, and Aletha Marie filed an answer and a counterpetition for divorce on July 21, 2020, wherein she sought spousal maintenance. Both parties executed a Partial Mediated Settlement Agreement (MSA) on October 24, 2023, which disposed of all issues in the suit except for Aletha Marie's request to receive spousal maintenance. The case proceeded to a final hearing on that issue, at which the following evidence was presented.

### A. *Aletha Marie's Testimony*

Due to her condition of episodic psychotic symptoms, at the time of the final hearing, Aletha Marie's testimony was brief, and much of her financial situation was testified to by her mother and guardian, Jeanette Eads. During her testimony, Aletha Marie provided that her mother had served as her guardian for the fifteen months prior to the final hearing. At that time, she had been seeing a psychiatrist for two years. Aletha Marie testified that when she began seeing her psychiatrist, Dr. Shamsuddin Pepermintwala, she was reporting auditory hallucinations. She reported to most frequently hearing a female voice which began "bolder," and as she received medication and treatment, the voice "faded out." Aletha Marie testified that she could not distinguish whether she was experiencing a hallucination or not, and prior to her treatment, she believed that there had been a device implanted in her.

Aletha Marie stated that she had not worked outside of the home since 2000. She had not applied for governmental disability assistance to supplement her income

---

[1]An informal or common-law marriage exists in Texas if the parties (1) agreed to be married, (2) lived together in Texas as husband and wife after the agreement, and (3) presented to others that they were married. *See* TEX. FAM. CODE ANN. § 2.401(a)(2) (West 2006); *Mills v. Mest*, 94 S.W.3d 72, 73 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

but had only recently learned of her ability to do so after receiving that information from her psychiatrist.

Aletha Marie was awarded the marital residence in the MSA and lived there alone; she confirmed that Oscar paid the expenses related to the home. Her plan was to sell the home and purchase a new residence that she could better afford with the cash from the sale. She also confirmed that she was awarded approximately $1.5 million in the MSA.

B. *Oscar's Testimony*

Oscar testified that he chose to initiate the separation and divorce because Aletha Marie had told him she did not want to be with him any longer and because he felt he needed to protect himself from her. Although Oscar had exercised primary custody of their son since the divorce was filed in 2020, Oscar did not request child support from Aletha Marie.[2] Oscar testified that he had paid all the expenses for the mortgage, home utilities, health insurance, auto insurance, and any other bills incurred after the parties separated. Oscar was ordered to pay $1,500 in temporary spousal support, in addition to the other expenses, in June 2022, and that amount was increased to $3,000 in April 2023. He stated that since January 1, 2022, he had paid approximately $180,000 for Aletha Marie's benefit, but he had not received any funds from her.

Oscar agreed to the terms of the MSA, including the awards to Aletha Marie of the marital residence and any proceeds from the sale; $245,000 from an E-Trade account; $100,000 due to be paid by June 30, 2024; $75,000 due to be paid by December 1, 2024; $100,000 due to be paid by June 30, 2025; 50 percent of any potential performance shares or potential restricted stock units; and one-half of his bonus through October 2024, which Oscar anticipated to be approximately $80,000.

---

[2]A.D. turned eighteen-years-old prior to the final hearing.

Oscar also agreed to provide Aletha Marie with COBRA health insurance for 36 months following the divorce and to pay the $386,000 owed to the IRS and the outstanding bill for Aletha Marie's attorney at the time of mediation.

Because the majority of the assets awarded to Aletha Marie were not readily liquid, Oscar prepared a schedule of payments and benefits until the restricted stock units were fully paid out, which totaled $1,761,168. Relating to the division of marital property, the schedule included payments of Oscar's potential restricted stock units, restricted stock units, bonus, and agreed lump-sum cash distributions. Oscar testified that in addition to that figure, the cars, health insurance coverage, and taxes that he would be paying off would amount to an additional, approximately $400,000 for Aletha Marie's benefit. He stated that through April of 2024, he had paid $37,608 toward the mortgage, insurance, and utilities for the marital residence, and that he agreed to continue to cover those expenses for eight months until she sold the home. The home was valued at $1.3 million, and Aletha Marie was estimated to receive approximately $800,000 upon its sale after deduction of the outstanding mortgage and realtor fees.

Oscar testified that he did not have any concerns about Aletha Marie's capability to work and noted that she was able to watch her granddaughter alone and drive herself to the courthouse that day. He did not dispute Aletha Marie's diagnosis of schizophrenia but disagreed with Dr. Pepermintwala's position that she was ineligible for work. In regard to the monthly expense sheet submitted by Aletha Marie, Oscar testified that he did not know if the amounts she provided were unreasonable.

C. *Guardian's Testimony*

Eads, Aletha Marie's mother and guardian, prepared a financial information statement providing the projected expenses that Aletha Marie would be responsible for upon the divorce based upon her payments as of the final hearing. She testified

4

that the information regarding home expenses was prepared with the understanding that Aletha Marie would not be responsible for a mortgage, in light of the plan to sell the marital residence and purchase a different residence with the proceeds. She reported $1,000 for property taxes and $300 for property insurance. Additionally, she testified that the utility expense for the future, undetermined residence was projected to be $500. Eads also reported $200 in uninsured medical expenses, which did not include Aletha Marie's current anti-psychotic prescription medication, but she could not recall what expense the figure was based on. The car insurance was projected to be $400, and gasoline expenses were estimated to be $180. The financial information statement also included expenses for Aletha Marie's groceries, cell phone, personal maintenance, life insurance, home and car maintenance, entertainment, and dining out—each derived from averaging those expenses over the preceding year. She testified that Aletha Marie would help A.D. with things he needed for school and related activities, and she confirmed that the expenses on the statement relating to A.D. and the grandchildren were calculated by itemizing and averaging the amount Aletha Marie spent each month. The statement also included a "Christmas Gift Sinking Fund" expense that was also generated by taking an average of the amount Aletha Marie spent on Christmas gifts throughout the prior year.

Eads also prepared a statement reflecting Aletha Marie's income for the accounting year prior to the final hearing, which showed that she had supplemented $32,000 of Aletha Marie's annual income. She testified that she supplemented approximately $2,600 of Aletha Marie's income per month to account for expenses exceeding the $3,000 that she was receiving in temporary spousal maintenance. As a result, Eads and Aletha Marie's attorney determined that Aletha Marie would need approximately $5,200 per month in spousal maintenance to meet her minimum reasonable needs.

5

Eads testified that Aletha Marie had not received any assets from the property division as of the final hearing. Aletha Marie was set to receive approximately $245,000 from an E-Trade account and approximately $800,000 once the marital residence was sold, but there were no other portions of the property division that were readily liquid to assist Aletha Marie with the payment of ongoing bills at that time.

On cross-examination, Eads testified that $9,000 of her supplement to Aletha Marie's's annual income were payments for attorney's fees and stated that she did not know that attorneys would no longer be needed after the divorce was finalized. With $9,000 deducted from Aletha Marie's monthly income, the final figure would be $48,000 annually, or $4,000 per month.

Eads stated that she had not yet applied for disability assistance on Aletha Marie's behalf because she was unaware that she could until advised by Aletha Marie's doctor. As of the final hearing, Eads had not taken any steps toward listing or selling the marital residence in the two weeks since the MSA had been filed with trial court, but she had discussed the steps with her guardianship attorney.

D. *Dr. Pepermintwala's Testimony*

Dr. Pepermintwala, testified that Aletha Marie was referred for treatment in January 2022 and, at the time of the final hearing, had received treatment for twenty-two months. Dr. Pepermintwala stated that Aletha Marie's delusions led to his diagnosis of schizophrenia. She was administered injections of anti-psychotic medication to treat her symptoms after her repeated unwillingness to take medication on her own. He stated that the out-of-pocket cost for Aletha Marie's medication and therapy sessions were $2,000 and $450, respectively. Dr. Pepermintwala testified that he believed Aletha Marie was not capable of making any rational, long-term decisions in her current state of mind. He asserted that she was psychotic, and

6

because of that, he could not agree that she would be capable of managing her finances independently.

Dr. Pepermintwala believed that Aletha Marie was incapacitated enough to require disability and could not, on her own, earn sufficient income consistently. However, he testified that in his experience, it could take up to eight years for a patient to receive disability distributions after the person's application. He explained that, because Aletha Marie presented well, she would likely be able to obtain a job, but her perception of reality was not consistent and could impair her ability to arrive at work on time and perform her assigned duties. He believed she was capable of driving herself, however, because driving is "straightforward" and "does not involve calculating abstract concepts," concepts with which schizophrenia patients have difficulty understanding, such as processing language or thoughts.

E. *The Trial Court's Ruling*

At the close of the final hearing, the trial court found that Aletha Marie was eligible for the relief she requested, and awarded her spousal maintenance in the amount of $4,000 per month until further order of the court with payments to begin on May 1, 2024 or one month after the closing date of the sale of the marital residence, whichever occurred earlier. Such payments were to be reduced by the amount of disability benefits that Aletha Marie would receive if she was deemed eligible. The trial court ordered Aletha Marie's guardian to begin the process of applying for disability benefits on Aletha Marie's behalf and provide proof of the application and any corresponding documents or correspondence to Oscar. The trial court did not set a deadline for the application. The trial court also announced: "[T]he [Family] Code permits a periodic review. I'm not going to set a review. But in no event will a review of this take place prior than two years from today's date."

On May 13, 2024, Oscar filed a request for findings of fact and conclusions of law and a motion to modify, correct, or reform the judgment, the latter of which

7

was overruled by operation of law. Tex. R. Civ. P. 329b(c). The trial court returned its findings of fact and conclusions of law on November 4, 2024, following our abatement of this appeal for same. Oscar then filed a request for additional or amended findings and conclusions on November 12, 2024, requesting that seven additional matters be addressed. The trial court filed its amended findings and conclusions on December 6, 2024, which included eighteen additional findings.

## II. *Spousal Maintenance: Governing Law & Standard of Review*

In his first issue, Oscar asserts that the trial court abused its discretion in awarding Aletha Marie spousal maintenance because she did not meet the specific eligibility requirements. *See* Fam. § 8.051(2)(A) (West 2020); *In re Marriage of Hale*, 975 S.W.2d 694, 697 (Tex. App.—Texarkana 1998, no pet.). Oscar does not challenge the trial court's finding that Aletha Marie suffered from an incapacitating mental disability, but specifically contends that: (1) the trial court incorrectly calculated Aletha Marie's minimum reasonable needs; (2) Aletha Marie has sufficient property from the division of marital assets to meet her needs; and (3) Aletha Marie's potential eligibility for disability payments should satisfy any deficiency in the property available to her to meet those needs.

### A. *Governing Law*

Spousal maintenance is "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse." Fam. § 8.001(1). Under Section 8.051 of the Texas Family Code, the trial court may, in its discretion, order spousal maintenance if the party seeking maintenance meets specific eligibility requirements. *Id.* § 8.051; *see Pickens v. Pickens*, 62 S.W.3d 212, 214–15 (Tex. App.—Dallas 2001, pet. denied). When, as here, a divorce is sought in a marriage lasting ten years or more, a spouse is eligible to seek spousal maintenance if the person lacks sufficient property to provide for their minimum reasonable needs and are "unable to earn sufficient income to provide

8

for [their] minimum reasonable needs because of an incapacitating physical or mental disability." FAM. § 8.051(2)(A).

Once a trial court determines a spouse is eligible to receive maintenance, it applies the factors set forth in Section 8.052 to determine the "nature, amount, duration, and manner of periodic payments.'" *Mehta v. Mehta*, 716 S.W.3d 126, 132 (Tex. 2025) (quoting FAM. § 8.052). In this regard, Section 8.052 sets out a non-exhaustive list of eleven factors to consider, including "each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage" and "the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance." *Id.* § 8.052(1), (4). The Family Code limits the duration of maintenance awards, unless the spouse seeking assistance is eligible for maintenance under Section 8.051(2)(A). *See id.* § 8.054(a)(2)(A), (b). If the spouse seeking maintenance is unable to support himself or herself through appropriate employment because of an incapacitating physical or mental disability, the trial court may order spousal maintenance for an indefinite period of time as long as the disability continues. *See id.* § 8.054(b) ("The court may order maintenance for a spouse to whom Section 8.051(2)(A) or (C) applies for as long as the spouse continues to satisfy the eligibility criteria prescribed by the applicable provision."). However, the statute limits the amount of maintenance ordered to $5,000 per month or 20 percent of the spouse's average monthly gross income, whichever is less, regardless of the type of eligibility of the receiving spouse. *See id*. § 8.055(a).

B. *Standard of Review*

"A trial court's decision to award spousal maintenance is reviewed for an abuse of discretion." *Mehta*, 716 S.W.3d at 131. A trial court abuses its discretion if it acts arbitrarily, unreasonably, or fails to analyze or apply the law correctly. *Id.* "While insufficiency of evidence is not an independent ground on which to challenge

a spousal-maintenance award, an award that is not supported by legally sufficient evidence may constitute an abuse of discretion." *Id.* (citing *In re J.Y.O.*, 709 S.W.3d 485, 497 n.92 (Tex. 2024)).

"Evidence is legally sufficient if there is 'more than a mere scintilla' to support a vital fact-finding, i.e., 'the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). "Reviewing courts must consider evidence in the light most favorable to the judgment and its findings, 'indulg[ing] every reasonable inference that would support it.'" *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). "Under an abuse of discretion standard, we will not reverse the trial court's judgment if the trial court reaches a correct result even for a wrong reason." *Diaz v. Diaz*, 350 S.W.3d 251, 256 (Tex. App.—San Antonio 2011, pet. denied).

## III. *Discussion*

### A. *Eligibility*

Oscar challenges Aletha Marie's eligibility for spousal maintenance. He contends that the trial court erroneously determined the amount of her minimum reasonable needs and the property available to her at the time of dissolution. As the spouse seeking maintenance, Aletha Marie bore the burden to establish the statutory requirements for eligibility. *Boothe v. Boothe*, 681 S.W.3d 916, 927 (Tex. App.—Houston [14th Dist.] 2023, no pet.). That Aletha Marie suffered from an incapacitating mental disability is not in dispute. As discussed below, considering the totality of the evidence in the light most favorable to the trial court's judgment, we hold that Aletha Marie presented sufficient evidence to support the trial court's determination of the amount of her minimum reasonable needs. Additionally, the record supports the trial court's findings that she lacked sufficient property

and earning ability to provide for her minimum reasonable needs. *See* FAM. § 8.051(2)(A); *Mehta*, 716 S.W.3d at 134.

### 1. *Aletha Marie's minimum reasonable needs*

Oscar challenges the trial court's finding that Aletha Marie's minimum reasonable needs were $5,200 per month. At the final hearing, Aletha Marie offered into evidence a financial information statement reflecting that her monthly expenses totaled $5,375. The statement also provided that deducting the monthly temporary spousal support ordered at the time left Aletha Marie with approximately $2,200 in expenses, resulting in $5,200 as the spousal maintenance required at the time. While the trial court did not specifically base its determination of Aletha Marie's minimum reasonable needs on the financial information statement in its findings of fact, the total provided aligns with the trial court's determination. As a result, Oscar attacks specific items listed as expenses and contends they cannot or should not be considered to qualify as Aletha Marie's "minimum reasonable needs." In particular, he identifies three different categories of expenses.

The first category is meant to signify expenses that Oscar contends are "simply not needs." Those expenses include entertainment, eating out, life insurance, money for their son and grandchildren, a Christmas gift fund, and Aletha Marie's dog's veterinarian, grooming, and food expenses. Oscar asserts that the expenses for life insurance, their son and grandchildren, Christmas gifts, and the dog are not actually for Aletha Marie's personal benefit. He further asserts that the expenses for entertainment and dining out are for Aletha Marie but cannot be considered a form of reasonable need. These expenses total $1,285, and Oscar contends that they should be deducted from the calculation of her "minimum reasonable needs," capping her expenses at $3,915 per month.

The next category of expenses are those that Oscar contends relate to the parties' marital residence, including property taxes, property insurance, utilities, and

"home maintenance (yard, pool, repairs)," totaling $2,250 per month. Oscar's position is that, while housing expenses can certainly fall within "minimum reasonable needs," Aletha Marie was not obligated to pay those expenses either before or after the divorce. In support, he provides that the residence was required to be sold as a part of the final divorce decree, with Oscar advancing the cost of the mortgage, taxes, insurance, and utilities prior to the sale. He asserts that some form of rent or housing should have been included in the statement, but Aletha Marie failed to provide a reasonable estimate of the cost for the type of residence she would seek after the sale of the martial home.

The final category relates to transportation costs. He asserts that, while transportation is likely considered to fall within "minimum reasonable needs," Aletha Marie testified that she did not drive often. She was awarded three vehicles in the property division, and Oscar argues that, while Aletha Marie's family members may be driving the cars and incurring the expenses, Aletha Marie's testimony suggests that she would not be incurring the $680 in reported transportation costs.

Oscar contends that removing these expenses would leave Aletha Marie's need at $985 per month. Oscar argues that even if the final figure is "slightly higher," it would still be far below the $5,200 reported.

As we have said, we will not disturb an order awarding spousal maintenance unless the trial court abuses its discretion. *Sheshtawy v. Sheshtawy*, 150 S.W.3d 772, 777 (Tex. App.—San Antonio 2004, pet. denied). "There is no abuse of discretion if some evidence of a substantive and probative nature supports the decision." *Trueheart v. Trueheart*, No. 14-02-01256-CV, 2003 WL 22176626, at \*2 (Tex. App.—Houston [14th Dist.] Sept. 23, 2003, no pet.) (mem. op.); *Dennis v. Smith*, 962 S.W.2d 67, 68 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). The trial court made thirty-four findings of fact and two conclusions of law relating to its

maintenance award and determined that Aletha Marie's minimum reasonable needs were $5,200 per month and her "unmet minimum reasonable needs" were $4,000 per month. "Findings of fact in a case tried to the [trial] court have the same force and dignity as a jury's verdict upon questions," and we apply the same sufficiency standards as if reviewing evidence supporting a jury's answer. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *In re Marriage of Mullis*, No. 13-23-00446-CV, 2025 WL 1403676, at *3 (Tex. App.—Corpus Christi–Edinburg May 15, 2025, no pet.) (mem. op.).

The term "minimum reasonable needs" is not defined in the Family Code. *See Cooper v. Cooper*, 176 S.W.3d 62, 64 (Tex. App.—Houston 2004, no pet.). Trial courts generally have discretion to determine a spouse's "minimum reasonable needs" on a case-by-case, fact-specific basis. *Id.*; *see, e.g.*, *Martinez v. Martinez*, No. 02-21-00353-CV, 2022 WL 17986023, at *2 (Tex. App.—Forth Worth Dec. 29, 2022, no pet.) (mem. op.) ("[T]he minimum reasonable needs for a particular individual is a fact-specific determination that should be made by the trial court on a case-by-case basis."). "Although an itemized list of monthly income and expenses is the most 'helpful' evidence to establish eligibility, neither the Family Code nor [precedent] require exactitude." *Mehta*, 716 S.W.3d at 132, 135; *Diaz*, 350 S.W.3d at 254–55; *Trueheart*, 2003 WL 22176626, at *2.

At the final hearing, Eads testified to the financial information statement reflecting a total of approximately $5,300 in expenses. According to her testimony, the property-related expenses were estimates based on the new home that Aletha Marie planned to purchase after the sale of the marital residence. The trial court ordered the spousal maintenance payments to begin on May 1, 2024, or thirty days after closing, after Oscar's obligation to pay expenses relating to the marital residence ended, which indicates that the trial court considered property-related expenses to pertain to the new residence Aletha Marie planned to purchase. Eads

13

also confirmed that the car insurance expense was based on the current payments for the vehicles Aletha Marie was awarded in the division of property, and the remainder of the expenses were an average of the amount Aletha Marie had spent on each category over the prior year. When questioned about the expenses, Oscar claimed that he did not know if they were unreasonable.

Eads also provided Aletha Marie's annual income, derived from deposits into Aletha Marie's account. The figures from this sheet reflect a total of $56,941.64 for the accounting year, or an average of $4,745.13 per month, and that $32,000 of that total was supplemented by Eads. Eads testified that $9,000 of the supplemental income she provided may have been used for attorney's fees, and if that $9,000 were deducted from the total annual income, the resulting figure would be approximately $48,000. This would indicate that Aletha Marie's annual income may more accurately have been $4,000 per month.

The trial court had the opportunity to hear the testimony of the witnesses and review the evidence admitted at the final hearing. As the trier of fact, it was the trial court's role to determine the credibility of that evidence. *Illiff v. Illiff*, 339 S.W.3d 74, 83 (Tex. 2011) (citing *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 567 (Tex. 2000)). Considering the evidence in the light most favorable to the trial court's judgment and its findings, the record supports the trial court's determination of Aletha Marie's "minimum reasonable needs" to be $5,200 and her "unmet minimum reasonable needs" to be $4,000.

2. *Aletha Marie's Insufficient Property to Meet Minimum Reasonable Needs*

Oscar also challenges the trial court's determination that Aletha Marie lacked sufficient property to meet her minimum reasonable needs. He asserts that the delivery of assets to Aletha Marie was assured, and all property was anticipated to be fully liquid within two years of the judgment. He also contends that the value of

the property awarded to Aletha Marie in the division of martial assets is more than adequate to provide for her minimum reasonable needs.

As previously noted, Section 8.051 requires that the party seeking spousal maintenance have insufficient property to meet their minimum reasonable needs. FAM. § 8.051. However, "the Family Code does not expressly state what property courts should consider available 'to provide for the spouse's minimum reasonable needs.'" *Mehta*, 716 S.W.3d at 132 (quoting Fam. § 8.051). In determining the issue of whether a spouse has sufficient property, a court may consider the spouse's monthly income, the value of the spouse's separate property, and the value of the property awarded to the spouse through dividing the marital estate. *Mehta v. Mehta*, 703 S.W.3d 100, 114 (Tex. App.—Fort Worth 2023) *rev'd on other grounds*, 716 S.W.3d 126, 133–134 (Tex. 2025). "When the quantitative evidence is incomplete or otherwise imperfect, a trial court can credit qualitative testimony about a spouse's inability to pay essential, basic living expenses . . . to conclude that a spouse seeking maintenance will lack sufficient property to provide for his or her minimum reasonable needs." *Mehta*, 716 S.W.3d at 135. Also, as part of its inquiry, "the trial court may consider the liquidity of the assets awarded and their ability to produce income," but "the law does not require the spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet short-term needs." *Schafman v. Schafman*, No. 01-20-00231-CV, 2022 WL 962466, at *6 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, no pet.) (mem. op.); *see Mehta*, 716 S.W.3d at 132–33.

Whether a spouse has sufficient property to meet their minimum reasonable needs is determined "on dissolution of the marriage." FAM. § 8.051; *Schafman*, 2022 WL 962466, at *5. The trial court is not required to determine whether a person seeking spousal support will be able to provide for their minimum reasonable needs at some point in the future. *See Slicker v. Slicker*, 464 S.W.3d 850, 863 (Tex. App.—

Dallas 2015, no pet.). Instead, the trial court must only consider the requesting spouse's eligibility for maintenance at the time of the divorce. *Id.*

The trial court made specific findings regarding Aletha Marie's property upon dissolution of the marriage in its amended findings of fact and conclusions of law, including:

> 3. [Appellee] will lack sufficient property on dissolution of the marriage to provide for her minimum reasonable needs
>
> . . . .
>
> 9. The property awarded to [Appellee] pursuant to the parties['  MSA] was introduced into evidence and considered by the court in full. The items listed herein were specifically testified to during the hearing on this matter.
>
> 10. The performance shares and restricted stock awarded to [Appellee] are not readily available to her upon divorce, and any anticipated distributions diminish quickly. [Appellant] provided anticipated payments, but these are not guaranteed to [Appellee].
>
> 11. [Appellee] was awarded the residence where she lives. Any anticipated net sales proceeds are merely speculation, and those funds are not immediately available to [Appellee]. The funds must be used to procure a new residence for [Appellee].
>
> 12. [Appellee] is to receive cash payments from [Appellant], but the payments do not begin until June 30, 2024, and they conclude on June 30, 2025.
>
> 13. Each party was to receive one half of [Appellant's] bonuses through October. Those payments will not be available to [Appellee] immediately upon dissolution of the marriage.
>
> 14. [Appellant] has agreed to pay 36 months of COBRA health insurance for [Appellee]. Without insurance, [Appellee's] medical injections would cost $2000 per month and her mental health appointments would cost $500 per month.
>
> 15. Pursuant to the parties' [MSA, Appellee] will be awarded three vehicles. She may be able to sell two of them, but those funds are not readily available to her upon dissolution of the marriage.

16

16. [Appellee] was awarded $245,000 from the E trade account, but she has not received those funds.

17. The guardianship proceedings require the guardian to obtain permission before assets of the ward may be liquidated.

18. [Appellant] agreed that the property awarded to [Appellee] was not readily liquid

. . . .

29. The Court finds [Appellee] has minimal resources available to her on the date of dissolution and, while she is likely to receive distributions of property in the future, the resources she does have presently justify calculation of her unmet minimum reasonable needs to be $4,000 per month with potential reduction in the future if she receives disability benefits.

Oscar proffered a schedule of payments and benefits to Aletha Marie regarding the divided marital assets, but that document reflected that Aletha Marie already had possession of the $245,000 from the E-trade account. However, his testimony at the final hearing confirmed that Aletha Marie had not yet been given possession of those funds. Additionally, that schedule of payments and benefits demonstrated how additional assets, including the portions of potential restricted stock units, restricted stock units, bonus funds, and Oscar's agreed payments, would be issued to Aletha Marie over the two years following the final hearing, as none were readily liquid or due to be paid. Though Aletha Marie was awarded three vehicles and the marital residence, these assets could not immediately be sold because Eads was required to obtain permission from the trial court before taking action. Further, Aletha Marie's sole source of income at the time of the final hearing was the temporary spousal maintenance of $3,000 and any supplements provided by Eads. Aletha Marie testified that she had not worked outside the home since 2000, and her doctor maintained that she was unable to maintain long-term employment due to her mental disability—both evidencing insufficient income at the time of the final hearing.

17

The evidence indicates that Aletha Marie would be unable to readily access any funds from the property division and, additionally, did not possess consistent, independent income at the time of the final hearing. Therefore, the trial court did not err in its determination that Aletha Marie possessed insufficient funds upon dissolution of the marriage to provide for her minimum reasonable needs.

### 3. *Disability Assistance as Income Available to Meet Aletha Marie's Minimum Reasonable Needs*

Oscar finally contends that, because Aletha Marie may be eligible to receive disability assistance, such income should be considered in the determination of whether she possessed sufficient property to meet her minimum reasonable needs. However, he cites no authority to support this argument. He instead simply argues that the trial court ordered him to "replace" the disability income Aletha Marie would have received "if she had exercised diligence in applying for it," and even potential, undetermined disability assistance payments would cover any shortfall from assets awarded in the division of marital property to meet her minimum reasonable needs.

As previously noted, a trial court is not required to determine whether a person seeking spousal support will be able to provide for their minimum reasonable needs at some point in the future. *See Slicker*, 464 S.W.3d at 863. The timing for such a determination is "upon the dissolution of the marriage." *Id.*; *see* FAM. § 8.051

At the final hearing, Aletha Marie and Eads testified that they were unaware of her potential eligibility for disability payments until they received the information from her psychiatrist. That information was shared during Dr. Pepermintwala's deposition in October 2023, and, according to Aletha Marie, it was the first time that she learned of her potential to receive disability payments. Aletha Marie had not applied for or been found eligible to receive disability payments at the time of the final hearing, and as a result, the trial court was unable to consider such payments in

18

its determination of property available to Aletha Marie to meet her minimum reasonable needs.

However, the trial court did consider the possibility for disability payments in its final ruling. The trial court ordered that any disability payments that Aletha Marie receives, or that Eads receives for the benefit of Aletha Marie, must be deducted from the amount Oscar is ordered to pay in spousal maintenance each month. Additionally, as the trial court noted at the final hearing, if the payments received were in excess of the $4,000 in spousal maintenance ordered, Oscar's obligation would be extinguished. Eads was ordered to apply for disability benefits on Aletha Marie's behalf and provide Oscar with any corresponding documents or communications related to the process. The trial court did not designate a deadline for the application, but, if Oscar availed himself to a periodic review of the order, the trial court would inquire about the status of the application. In sum, any disability payments that Aletha Marie receives would already reduce the amount of spousal maintenance that Oscar is ordered to pay, and absent a figure to base its determination on at the time of the dissolution of the marriage, the trial court could not have assigned such income to Aletha Marie.

Finally, Aletha Marie was not required to demonstrate to the trial court that she had made diligent efforts to obtain disability assistance. *See generally* FAM. § 8.051(2)(A). Therefore, the trial court did not abuse its discretion in excluding potential disability payments from the determination of Aletha Marie's property upon the dissolution of the marriage.

Accordingly, we overrule Oscar's first issue.

## B. *The Trial Court's Restriction Regarding Periodic Reviews*

In his second issue, Oscar asserts that the trial court "erroneously altered a statutory scheme by restricting [his] ability to seek a future modification of the

spousal maintenance" order until after October 24, 2025. The final divorce decree provides:

> 3. This order for spousal maintenance shall be subject to a Periodic Review by this Court upon the request of [Appellant], not to occur any earlier than October 24, 2025.

> 4. The Court may modify this order for Spousal Maintenance at any time after October 24, 2025 upon proper request by [Appellant].

Oscar requests that the final decree be reformed by striking "after October 24, 2025," and inserting "as provided by Chapter 8 of the Texas Family Code."

Even if we construed the judgment to restrict Oscar's ability to file for modification, the deadline set by the trial court has passed, rendering Appellant's second issue moot. "Under the Texas Constitution's separation-of-powers doctrine, courts lack jurisdiction to issue an advisory opinion, the 'distinctive feature' of which is that it 'decides an abstract question of law without binding the parties.'" *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 689 (Tex. 2022) (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)); *see* TEX. CONST. art. II, § 1. "A case becomes moot if, since the time of filing, there has ceased to exist a justiciable controversy—that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012). Oscar is now able to seek a modification or even a periodic review without any restriction, and any reformation of the final decree by this court would have no real effect on his ability to seek modification moving forward. *See McNeill v. Hubert*, 23 S.W.2d 331, 333 (Tex. 1930) ("A case becomes moot when it . . . seeks

20

judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy.").[3]

In the event that the issue is not moot, we conclude that the trial court did not err in restricting the permissive, discretionary periodic review of its order for maintenance to approximately one and one-half years from the date of its judgment. *See* FAM. § 8.054(c). Aletha Marie argues that, as to the provision regarding a periodic review, the trial court did not impose a restriction but rather granted relief *beyond* a modification by granting Oscar the opportunity for a "periodic review," that is not required by Chapter 8 of the Family Code. Additionally, Aletha Marie asserts that the trial court's finding as to modification does not restrict when Oscar can *file* for a modification, and that the trial court's order to modify can be applied to any payment that accrues after a motion to modify is filed. We agree.

### 1. *Governing Law*

Section 8.054(c) provides that "on the request of either party or on the court's own motion, the court *may* order the periodic review of its order for maintenance" when awarded pursuant to Section 8.051(2)(A) or (C), as both provisions permit indefinite awards. *See* FAM. § 8.054(b), (c) (emphasis added). The purpose of a

---

[3]Even so, Oscar failed to provide adequate authority to support his argument. Rule 38.1(i) of the Texas Rules of Appellate Procedure requires that an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). The sole authority Appellant provides for his assertion is a holding from *Holmes v. Kent*, 221 S.W.3d 622 (Tex. 2007). There, the supreme court held that, as to the appellant's specific request, the creation of a constructive trust to allocate teacher retirement benefits would result in an improper alteration of the Teacher Retirement System's statutory obligation in measuring the duration of payments. *Holmes*, 221 S.W.3d at 628. While implicating statutory alteration generally, *Holmes* does not provide support for Appellant's assertion that the trial court erroneously altered the spousal maintenance modification provision in Section 8.057. *See* FAM. § 8.057 (allowing for the modification of a maintenance award following the filing of a proper motion). Although Oscar's brief contains citation to the appellate record in support of his claims, he has provided no citations to applicable legal authority. Therefore, Oscar failed to adequately brief his second issue. *See* TEX. R. APP. P. 38.1(i); *George v. Cypress Springs Property Owners Association*, 668 S.W.3d 877, 890 (Tex. App.—El Paso 2023, no pet.) ("Although we are to construe appellate briefs liberally, a party's failure to provide citations to applicable legal authority in support of an appellate claim may result in waiver of the claim.").

periodic review is to determine whether disability continues to render the spouse unable to support herself through employment. *See id.* 8.054(b); *Hackenjos v. Hackenjos*, 204 S.W.3d 906, 909 (Tex. App.—Dallas 2006, no pet.). A review of the continuation of the order does *not* require the petitioner to show a material and substantial change of circumstances. *Hackenjos*, 204 S.W.3d 909. Rather, the party seeking continuation of the order must show by a preponderance of the evidence that: (1) their incapacitating disability continues, and (2) the incapacitating disability prevents them from supporting themselves though appropriate employment. *Id.* The trial court is not required to impose parameters for review of such an award. *Soto v. Soto*, 656 S.W.3d 767, 772 (Tex. App.—El Paso 2022, no pet.). The decision to provide a periodic review is discretionary and does not have to be included in the final decree. *O'Carolan v. Hopper*, 414 S.W.3d 288, 308 (Tex. App.—Austin 2013, no pet.).

Section 8.057 controls the modification of a spousal maintenance order and provides that an order for spousal maintenance may be modified upon the filing of a motion in the court that rendered the order. FAM. § 8.057(a). To seek modification, "[a] party affected by the order or the portion of the decree to be modified may file the motion." *Id.* The trial court may modify the maintenance order after a hearing and upon a showing of "material and substantial change in circumstance[,] . . . including circumstances reflected in the factors specified in Section 8.052." *Id.* § 8.057(c). A trial court has discretion as to the date it applies a modification so long as it is after the motion to modify is filed. *Wallace v. Wallace*, 690 S.W.3d 718, 724–25 (Tex. App.—San Antonio 2024, no pet.).

> Unlike a motion to modify maintenance where the movant is required to prove a material and substantial change in circumstances of one of the parties before the court can modify its prior order to reduce or terminate maintenance, a request for the trial court to review continuation of the spousal maintenance order appears to place no

special burden of proof on the movant other than to prove by a preponderance of the evidence that his or her disability is continuing.

*Crane v. Crane*, 188 S.W.3d 276, 280 (Tex. App.—Fort Worth 2006, pet. denied) (citing FAM. § 8.057(c)). However, the burden falls on the petitioner to show a material and substantial change of circumstances if he requests a reduction in the amount awarded in an order for continuation of spousal maintenance. *Id.*

### 2. *Standard of Review*

When interpreting a divorce decree, we apply the general rules regarding the construction of judgments. *Shanks v. Treadway*, 110 S.W.3d 444, 447 (Tex. 2003) (citing *Wilde v. Murchie*, 949 S.W.2d 331, 332 (Tex. 1997)). "Judgments should be construed as a whole to harmonize and give effect to the entire decree." *Id.* "If the decree is ambiguous, the court should review the record along with the decree to aid in interpreting the judgment." *Id.* (citing *Wilde*, 949 S.W.2d at 332). In addition, if it is ambiguous—that is, subject to more than one reasonable interpretation—we will adopt the construction that correctly applies the law. *Shanks*, 110 S.W.3d at 447 (citing *MacGregor v. Rich*, 941 S.W.2d 74, 75 (Tex. 1997)).

### 3. *Discussion*

The trial court was not obligated to provide Oscar with a periodic review of its spousal maintenance order. Granting such a review is within the trial court's sound discretion, and thus, the court did not err in designating that the review occur after October 24, 2025. *See Hackenjos*, 204 S.W.3d at 909–10 (where the trial court provided for a periodic review of the spousal maintenance order after a period of three years); *see also Czarkowski-Golejwski v. Wilson*, No. 07-24-00127-CV, 2025 WL 20566, at *1 (Tex. App.—Amarillo Jan. 2, 2025) (mem. op.) (op. on remand) (where the trial court ordered spousal maintenance to continue for approximately three years, at which time the matter would be revisited).

At Oscar's request, the trial court would review whether continuation of the indefinite order would be warranted, and the burden to show that her incapacitating disability continued and prevented her from gaining employment would fall to Aletha Marie. *Crane*, 188 S.W.3d at 280. If Oscar later requested a reduction of the amount of spousal maintenance ordered, he would be obligated to prove a material and substantial change in circumstances. *Id.*

The construction giving effect most fully to the entire decree is not that the provision acts as a restriction on Oscar's right to file for modification. Upon a material and substantial change of circumstances of either party, Oscar could petition the trial court for modification of its order, and the trial court possesses discretion to apply a modification to any payment accruing after the date of filing. FAM. § 8.057(a), (c)(1); *Wallace*, 690 S.W.3d at 724–25. Rather, the provision appears to refer to the trial court's anticipated periodic review of its order, which it expressly permitted within two years of the final hearing.

Therefore, we overrule Oscar's second issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. BRUCE WILLIAMS
JUSTICE

April 9, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.